## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| AYA HEALTHCARE, INC., | |
| *Plaintiff,* | |
| v. | Case No. 3:24-cv-000390-B |
| RALPH DE LA TORRE and MEDICAL PROPERTIES TRUST, INC., | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

## FIRST AMENDED COMPLAINT

Plaintiff, Aya Healthcare, Inc. ("Aya"), based upon knowledge, information and belief, hereby states and asserts the following Complaint against defendants Ralph de la Torre ("de la Torre") and Medical Properties Trust, Inc. ("MPT," and collectively with de la Torre, the "Defendants").

## Introduction

1.      Defendant Ralph de la Torre is the CEO and ultimate owner of a majority of the equity in Steward Health Care System, LLC ("Steward"), a for-profit company that operates hospitals throughout the United States.

2.      In January 2021, Steward, which at the time owned more than 30 hospitals, was in financial crisis.  It had just finished a year where it lost over $400 million dollars, and its liabilities exceeded its assets by nearly ***one and a half billion*** dollars.

3.      Innumerable vendors had placed Steward on credit hold, ceased doing business with Steward altogether, and/or filed lawsuits for unpaid invoices for amounts ranging from tens of thousands to tens of millions of dollars.

4.      Also at this time, ten months into the COVID-19 pandemic, the United States was in the middle of perhaps the most significant health care crisis in the country's history.

5.      In the face of these most dire circumstances for Steward's mostly COVID-inflicted patients and their vulnerable healthcare practitioners, what did Steward do? Did it seek to preserve cash to ensure that it could pay key vendors to keep its critical hospitals operating at peak levels? No. Steward did the opposite.

6.      In January 2021, Steward paid a $111 million dividend to its equity holders, with the majority of these funds ultimately transferred to de la Torre personally.  de la Torre used these funds to support a lavish lifestyle, including the ownership of two luxury yachts collectively estimated to be worth over $65 million.

7.      Approximately 10% of that dividend went to Defendant Medical Properties Trust ("MPT"), which was (and is) directly or indirectly a minority shareholder of Steward and also the landlord that owns much of the real estate on which Steward operates its hospitals.

8.      On information and belief, de la Torre, as CEO and a member of Steward's board, authorized payment of the dividend with full knowledge of Steward's finances.  He did so to hinder, defraud or delay creditors by taking cash needed to pay Steward's debts and funneling it to himself and MPT.  The dividend provided no value to Steward and was made at a time when Steward was clearly and massively insolvent.

9.      Plaintiff Aya, a staffing company that provides, among other things, travel nurses to hospitals, was one of Steward's critical service providers that has gone unpaid.  Steward breached an agreement pursuant to which Aya had agreed to provide much needed nursing services.  At the time the dividend was made, Aya was owed in excess of $7 million in unpaid fees, and the amount presently due to Aya now stands at over $45 million.

10.     These facts make the dividend avoidable as a fraudulent conveyance and recoverable by Aya, which has been a creditor of Steward since before the date that the dividend was made, from de la Torre and MPT, as immediate or subsequent transferees of the dividend.

11.     Aya brings this action pursuant to the Texas version of the Uniform Fraudulent Transfer Act to avoid the dividend payments to the extent necessary to pay its overdue debt from Steward.

## The Parties

12.     Plaintiff, Aya Healthcare, Inc., is a corporation organized under the laws of Delaware with its principal place of business at 5930 Cornerstone Court West, Suite 300, San Diego, California.

13.     Defendant, Ralph de la Torre is an individual with a principal residence in Dallas, Texas.

14.     Defendant Medical Properties Trust, Inc. is a corporation organized under the laws of Maryland with its principal place of business in Alabama.

## Jurisdiction and Venue

15.     Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

16.     This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because Aya, a citizen of Delaware and California, seeks damages greater than $75,000 against de la Torre, a citizen of Texas, and MPT, a citizen of Maryland and Alabama.

17.     This Court has general and specific personal jurisdiction over Defendants pursuant to due process and/or the Texas Long Arm Statute due at least to their systematic and continuous contacts with the State of Texas, including physically residing in the state or conducting regular

business in the state through the operation of multiple hospitals and ownership of real property in the state of Texas.

18.     This Court has personal jurisdiction over Defendant de la Torre as an individual residing in Dallas County, Texas.

19.     This Court has personal jurisdiction over Defendant MPT based on its regular and systematic contacts with the State of Texas, including ownership of real property in Texas.

20.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims asserted herein occurred in this District.

21.     Venue is proper in this District under 28 U.S.C. § 1391 because de la Torre is a resident, and at home, in the State of Texas and this District, and thus has sufficient contacts with this District for personal jurisdiction.

22.     Venue is proper in this District under 28 U.S.C. § 1391 because MPT is deemed to reside in the State of Texas and this District because MPT is subject to this Court's personal jurisdiction for this action.

## Factual Background

### A.  Steward Ownership History and Relationship with MPT

23.     Steward is one of the largest, privately owned, for-profit health care networks in the nation.  It operates approximately 32 hospitals in eight U.S. states, including Arizona, Arkansas, Florida, Louisiana, Massachusetts, Ohio, Pennsylvania, and Texas.

24.     Steward was formed in 2010 when private equity firm Cerberus Capital Management ("Cerberus") funded the acquisition by Steward of the former Caritas Christi network of six Catholic hospitals located in Massachusetts.  de la Torre, a heart surgeon who was CEO of

Caritas and was instrumental in pulling together the Cerberus buyout, has been CEO of Steward since its formation.

25.     On information and belief, in the first four years after its formation, Steward posted operating losses, only turning a profit in 2015, primarily due to a restructuring of its pension obligations to employees.

26.     MPT is a self-advised real estate investment trust formed in 2003 to acquire and develop net-lease hospital facilities.  Today, it is one of the world's largest owners of hospital real estate, with 441 facilities.

27.     In late 2016 or early 2017, Steward entered into a sale-leaseback transaction with MPT, pursuant to which MPT paid Steward approximately $1.2 billion to purchase all of its hospital properties.  As part of the deal, MPT agreed to lease those properties back to Steward. MPT also purchased a 5% equity stake in Steward in connection with this transaction.

28.     The MPT deal provided Steward with an influx of cash, which it used to pay down existing debt and, on information and belief, to make an equity dividend to Cerberus.

29.     The MPT sale-leaseback transaction also saddled Steward with significant rent obligations to MPT going forward, which, on information and belief, exceeded $120 million in the first year following the deal.

30.     In the years following the initial sale-leaseback transaction with MPT, Steward engaged in a series of transactions pursuant to which it acquired multiple hospitals outside of Massachusetts, with many of these deals funded by MPT.  On information and belief, these transactions included the following:

- In 2017, MPT provided Steward with $301 million for a buyout of eight hospitals from Community Health Systems.

- Also in 2017, MPT provided Steward with $1.4 billion toward Steward's $1.9 billion acquisition of the IASIS hospital chain.

- In 2018, MPT provided Steward with $764 million to acquire five additional hospitals.

31.     In connection with the IASIS transaction, MPT also invested an additional $100 million in Steward, increasing its ownership stake to approximately 10%, with Cerberus holding the remaining 90% ownership interest at that time.

32.     On information and belief, MPT holds its equity in Steward through MPT Sycamore OPCO LLC ("MPT Sycamore"), which is a wholly owned subsidiary of MPT.

33.     In June 2020, a group of doctors led by de la Torre acquired control of Steward pursuant to a recapitalization transaction in which Cerberus' controlling interest in Steward was exchanged for a convertible note.  Following this transaction, the de la Torre led management group controlled 90% of the equity in Steward while MPT maintained its previous 10% stake.

34.     On information and belief, the de la Torre led group held its controlling interest in Steward through Steward Health Care Holdings LLC ("SHCH").

**B.     Aya Becomes a Significant Creditor of Steward**

35.     Aya provides temporary clinician (e.g., nurse) and allied staffing services to healthcare facilities located across the United States including facilities managed by Steward.

36.     On March 11, 2020, the COVID-19 outbreak was characterized as a pandemic by the World Health Organization. Shortly thereafter, states across the country shutdown, COVID-19-stricken patients filled many hospitals, and the need for nurses skyrocketed.

37.     Almost instantly, understaffed hospitals turned to Aya, and many other staffing agency providers in the industry, to provide traveling nurses to meet their critical needs during the pandemic.

38.     Aya's services were critical during the global pandemic and as demand for nurses across the country increased. To address that demand, Aya worked directly with healthcare facilities to meet their staffing needs. This is precisely the relationship that existed between Aya and Steward.

39.     On or about March 23, 2020, Aya and Steward entered a Crisis Staffing Services Agreement (the "Crisis Staffing Agreement"), pursuant to which Aya provided staffing services to Steward in the following states: Arizona, Arkansas, Florida, Louisiana, Massachusetts, Ohio, Pennsylvania, Texas, and Utah.

40.     Unbeknownst to Aya, from the time Steward contracted Aya's crisis-staffing clinician services, Steward had no intention to honor the terms of the parties' contract but rather planned to run up a huge account payable and then refuse to pay for large portions of those services.

41.     As clinicians were staffed in hospitals each week, Aya invoiced Steward at agreed-upon rates based upon the number of clinicians working and the total hours worked.

42.     Steward fell behind on its payment obligations to Aya almost immediately after the Crisis Staffing Agreement was signed.  Steward's first incomplete or missed payment on the Crisis Staffing Agreement occurred on or about June 22, 2020.

43.     From at least that date through the filing of this Complaint, Steward has not been current on payments owed under the Crisis Staffing Agreement, making Aya a creditor of Steward throughout that time period.

44.     Aya routinely notified Steward of overdue unpaid invoices.  In response, Steward strung Aya along, convincing it not to stop providing critical, pandemic-required nursing services for Steward patients, with false assurances that it would pay Aya's overdue invoices, and come current.

45.     On July 6, 2020, Daisy Davis, an Aya employee, emailed Steward's controller, Charles Thompson, to ask if there was "anyway we can get about a million paid this week, if not more?"  Receiving no response, Ms. Davis followed up on July 8, 2020, writing "Is there any way we can get a check cut for $1 million or more this would really help bring down the balance. The past two months we have been billing on average weekly about $700k."

46.     On July 8, 2020, Mr. Thompson finally responded that Steward "cut a check for close to $400K yesterday and I'm trying to see what else I can get."

47.     As to Steward's past due balances of nearly $1.35 million, by email on July 27, 2020, to induce Aya to continue to provide services, Thompson falsely assured Aya "I'm trying to get the rest pushed through."

48.     Steward continued to promise to pay overdue balances, but these promises fell short as Steward responded to Aya's demands with inconsequential payments, if at all.

49.     On October 15, 2020, Steward wrote to Aya again. Among other things, Steward falsely stated: "Regardless, we are definitely committed to working this [the unpaid invoices] down as fast as possible understanding that we don't exactly know if Covid will surge anywhere."

50.     Steward, however, continued to refuse to pay down its balance. As of December 21, 2020, Steward had an unpaid past due balance of over $7 million. On that day, Ms. Davis contacted Mr. Thompson again seeking payment for Steward's past due balance. In response to Ms. Davis' email, Mr. Thompson falsely promised that Steward would "be able to pick up the payment amounts in the new year."

51.     Contrary to Mr. Thompson's representations, Steward did not pick up the payment amounts in the new year.  As of January 1, 2021, Steward still owed Aya in excess of $7 million.

52.     Steward maintained a multi-million dollar, past-due balance owed to Aya throughout all of January 2021 and has each month since then. Steward's past-due balance exceeds $45 million as of the date of this Complaint, including amounts due under the Crisis Staffing Agreement as well as other amounts due.

### C.     Steward's Insolvency

53.     Aya was not the only Steward vendor experiencing problems getting paid by Steward. As the COVID-19 pandemic intensified throughout 2020, Steward was unable to pay its debts as they came due.

54.     At least 9 creditors, seeking over $63 million in damages, brought claims against Steward between 2019 and 2020 for unpaid amounts, and press reports indicate that Steward was generally experiencing financial difficulties.[1] Some of the larger lawsuits include:

a.  *CHS/Community Health Systems, Inc. v. Steward Health Care System LLC*, No. 2019-0165-JRS, Court of Chancery of Delaware, filed February 27, 2019 (seeking over $10 million in damages in initial pleadings, later requesting $18 million in damages);

b.  *Steward Health Care System LLC v. Cerner Corp.*, No 19-0625-IV, Chancery Court for Davidson County, TN, filed May 16, 2019 (Cerner counterclaimed for more than $42 million in outstanding invoices);

c.  *Phoenix Area Development Limited Partnership; Suns Legacy Partners, LLC; Phoenix Mercury Basketball, LLC v. Steward Health Care System; Does 1 through 20*, CV 2019-014878, Superior Court of Maricopa County, AZ, filed November 25,

---

[1] Alia Paavola, "Steward Directed Staff to Delay Payments to Vendors, Former Controller Says," Becker's CFO Report, August 6, 2020, https://www.beckershospitalreview.com/finance/steward-directed-staff-to-delay-payments-to-vendors-former-controller-says.html (last visited February 13, 2024) ("Steward instructed staff to delay payments to vendors in an effort to improve its short-term cash flow."); Eileen Appelbaum and Rosemary Batt, "Profiteers plunder hospitals, then line up for federal subsidies," Waco Tribune-Herald, April 7, 2020 https://wacotrib.com/opinion/columns/rosemary-batt-eileen-appelbaum-profiteers-plunder-hospitals-then-line-up-for-federal-subsidies/article_d848ffcc-f5fe-5d9b-8b0b-db26eb40c011.html (last visited February 13, 2024) (reporting that Steward "threatened to close Easton Hospital at midnight on Friday, March 27 – in the midst of the pandemic – if it did not get government subsidies" and arguing that Steward "may also be poised to line up for taxpayer bailouts designed more to subsidize its private equity business model than anything coronavirus-related").

2019 (alleging unpaid amounts in excess of $1,670,000 related to marketing and suite license agreements).

55.     In March 2020, as Steward's financial crisis worsened, Steward requested a $40 million bailout from the Pennsylvania state government that it claimed was necessary to keep the hospital it owned in Easton Pennsylvania open during the early stages of the pandemic.

56.     Ultimately, Steward sought and received in excess of $440 million in loans from the federal government under the Coronavirus Aid, Relief and Economic Security ("CARES") Act, but even this could not forestall Steward's growing financial woes.

57.     Steward's audited financial statements for year end 2020 show that it posted a loss of more than $400 million for the year.

58.     A major contributing factor towards these losses was Steward's mounting rent expense under its hospital leases with MPT, which amounted to approximately $385.2 million for the year 2020.

59.     Steward's 2020 financial statements also show that, as of December 31, 2020, Steward was insolvent by approximately $1.4 billion, with total assets of approximately $3.3 billion against total liabilities of approximately $4.7 billion.

60.     Steward's liquidity position was equally as dire as of year-end 2020, with current liabilities of $1.656 billion exceeding current assets of $1.389 billion, explaining Steward's need to string along critical vendors like Aya and others.

**D.     The Fraudulent Dividends**

61.     During the first quarter of 2021 (a) Steward could not pay its debts as they came due; and (b) Steward was balance sheet insolvent by approximately $1.4 billion.

62.     Despite these facts, in January 2021 Steward paid dividends to its equity holders in the collective amount of $111 million (the "Fraudulent Dividends").

-10-

63.     Approximately $100 million of the Fraudulent Dividends were paid to the ownership group headed by de la Torre, through SHCH which owned 90% of Steward's equity at the time (the "de la Torre Fraudulent Dividend").

64.     On information and belief, a majority of the funds making up the de la Torre Fraudulent Dividend were subsequently transferred to de la Torre personally.  On information and belief, de la Torre used these funds to support a lavish lifestyle, including the ownership of two luxury yachts estimated to be worth approximately $65 million.

65.     Approximately $11 million of the Fraudulent Dividends were paid to MPT, through MPT Sycamore, which owns the other 10% of Steward (the "MPT Fraudulent Dividend"). Pursuant to MPT's 2021 annual report, it accounted for the $11 million cash distribution that it received from Steward in the first quarter of 2021 as a return of capital.

66.     On information and belief, the Fraudulent Dividends were approved by Steward's Board of Directors, of which de la Torre, Steward's CEO, was a member.

67.     On information and belief, at the time the Fraudulent Dividends were made de la Torre, and the other members of Steward's Board, were aware of Steward's insolvency, including its inability to timely pay its debts in the ordinary course of business.

68.     The Fraudulent Dividends were made with the specific intent to hinder, defraud and delay creditors, like Aya, by removing funds from Steward that could have been used to pay Steward's mounting debts, including Aya's growing receivable, and paying those funds to Steward's equity holders.

69.     Steward received no value in return for the payment of the Fraudulent Dividends.

**E.** **Steward's Financial Condition Worsens after Payment of the Fraudulent Dividends.**

70.     Steward's financial condition only spiraled downward following payment of the Fraudulent Dividends as Steward continued to be unable to pay its debts when they came due, including its growing debt to Aya.

71.     Following payment of the Fraudulent Dividends, Steward's unpaid overdue balance to Aya continued to increase.  During this time, Steward induced Aya to continue to provide services by acknowledging the amount it owed, and by assuring Aya that Steward would reduce, if not come current on, its overdue balance, all without expressing any concern about the clinician's hourly rates in the invoices or any other basis to dispute the invoices.

72.     At the time, Aya did not know, and could not have known, that Steward never had the intention to pay fully the overdue invoices, or that Steward planned to allow unpaid amounts to balloon and then eventually to refuse to pay invoices as part of a calculated scheme to use the inordinate size of the receivable, as well as specious "disputes" and delay tactics, to attempt to coerce Aya into acceding to Steward's non-payments.

73.     Aya, to its detriment, relied upon these misrepresentations by Steward. Among other things, and in the context of the "crisis" that induced Aya to help Steward in the first place, Aya continued to perform services that it would have stopped providing but for Steward's misrepresentations. This caused Steward's already very large overdue balance to increase to over $40 million by March 2021, approximately two months after payment of the Fraudulent Dividend.

74.     On March 2, 2021, many months after Steward first started to accrue an overdue balance and in response to repeated requests from Aya for payment, Steward sent an email to Aya, in which it acknowledged "the roughly $42m outstanding after last week's billings" and proposed

a wholly inadequate payment plan pursuant to which Steward would pay Aya only $1,000,000 per week, increasing to $1,500,000 per week after ten weeks.

75.     The payment plan was conditioned on Aya continuing to provide these services and, at that time, Aya was providing services to Steward at an average cost per-week of approximately $2.5 million.  As a result, Steward's unpaid balance would have *increased* each week, rather than *decreased* under its proposed payment plan.

76.     Aya rejected Steward's inadequate payment plan.

77.     It was at that point that Steward decided the time had come to employ against Aya the playbook it had developed to try to avoid payment to other creditors:  speciously challenge the validity of the amounts due.

78.     On March 5, 2021, Steward sent Aya a letter in which it asserted, for the first time, that it was disputing Aya's rates, this despite the fact that it had paid thousands of invoices up to that date without any dispute, and expressly had acknowledged its $42 million payable.

79.     On March 8, 2021, Steward sued Aya in Massachusetts on the basis of its improper challenges to Aya's invoices.  Aya has asserted counterclaims for the over $45 million that it is owed.  That litigation is ongoing.

80.     Since payment of the Fraudulent Dividend, over 110 lawsuits have been filed against Steward, seeking over $155,000,000 in damages for obligations that have gone unpaid in the ordinary course of Steward's business.[2] A few examples include:

    a.  In 2021, numerous radiologists filed complaints against Steward in Massachusetts for failure to pay wages;

    b.  *Steward Healthcare System LLC, et al. v. Tenet Business Services Corporation, et al*, 2022-0289-SG, Delaware Court of Chancery, filed March 25, 2022 (seeking a

_____

[2]These figures do not include Aya's pending lawsuit against Steward, which seeks over $45 million in unpaid invoices.

redacted damages amount that, upon information and belief from court orders in the case, is in excess of $25 million);

c. *University of the Incarnate Word, et al. v. Southwest General Hospital, LP, et al.*, 2023CIo6767, District Court of Bexar County, TX, filed on April 5, 2023 (provider of physician residents alleging damages of $4,550,000);

d. *Palamerican Security Inc. v. Steward Health Care System, LLC and Bank of America, N.A.*, 2384CV01693, Suffolk Superior Court, MA, filed on July 26, 2023 (security provider alleging damages of $8,255,000);

e. *Olympus America Inc. v. Steward Medical Group*, 2023-C-3123, Court of Common Pleas, PA, filed on November 8, 2023 (medical equipment leasing company alleging damages of nearly $7,000,000);

f. *ProLink Healthcare, LLC v. Steward Health Care System, LLC and Bank of America, N.A.*, 2384CV02825, Suffolk Superior Court, MA, filed on December 13, 2023 (temporary nurses staffing agency alleging damages of $45,700,000);

g. *Agiliti Health, Inc. v. Steward Health Care System, LLC*, 3:24-cv-65, Northern District of Texas, TX, filed on January 9, 2024 (medical equipment leaser alleging damages of $4,312,000);

h. *Jared J. Spackman et al v. Steward Health Care Services, LLC and Iasis Healthcare Holdings, Inc.*, No. 240700095, District Court of Davis County, UT, filed on January 25, 2024 (derivative action to collect money owed by Steward to the Partnership; alleging damages of $25,000,000);

i. *Laboratory Corp. of America v. Steward Health Care System LLC*, DC-24-02204-L, Dallas County District Court, Dallas, TX, filed on February 9, 2024 (laboratory services provider alleging damages of $7,700,000).

81.     Eventually, Steward's severe financial distress caught up to its landlord and minority equity owner MPT.  In September and October 2023, Steward delayed paying a portion of rent due to MPT.  As a result, as of December 31, 2023, MPT reported being owed approximately $50 million in unpaid rent from Steward.

82.     In January of this year, MPT issued a press release in which it "announced plans to accelerate its efforts to recover uncollected rents and outstanding loan obligations" from Steward.

83.     MPT indicated that it is working with Steward on an "action plan" pursuant to which Steward is pursuing "several strategic transactions, including the potential sale or re-tenanting of certain hospital operations as well as the divestiture of non-core operations."

84.     As part of this plan, MPT indicated that Steward "also intensified measures to improve collections and overall governance, including establishment of a transformation committee comprised of newly appointed independent directors and submission of periodic cash activity and asset sale progress reports to MPT and [Steward's lenders]."

85.     Despite these efforts, MPT stated that "[t]here can be no assurance that Steward will successfully execute its plans" or that MPT "will recover all of its deferred rent and loans outstanding to Steward."

86.     Recent media reports indicate that Steward has engaged restructuring advisors "to evaluate options for its troubled business."[3]

## Count I
### Avoidance and Recovery of Fraudulent Transfers (Constructive)
### Against All Defendants pursuant to Tex. Bus. & Com. Code §§ 24.005(a)(2) & 24.006(a)

87.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set for the herein.

88.     In January 2021, a date that is within four years of the filing of this Complaint, Steward made the Fraudulent Dividends, pursuant to which Steward transferred $111 million in cash to its equity holders.

89.     At the time the Fraudulent Dividends were made, Aya was a creditor holding a claim against Steward by virtue of amounts that were due and owing from Steward to Aya under the Crisis Staffing Agreement.

---

[3]Alexander Gladstone, Jonathan Weil, and Soma Biswas, Steward Health Taps Restructuring Advisers Following Worsening Financials, Wall St. J. (Jan. 25, 2024), https://www.wsj.com/articles/steward-health-taps-restructuring-advisers-following-worsening-financials-1ebed2a1 (last visited Feb. 16, 2024).

90.     At all points in time from the date that the Fraudulent Dividends were made until the date of this Complaint, Aya has remained a creditor of Steward by virtue of amounts that are due and owing from Steward to Aya under the Crisis Staffing Agreement and other amounts due.

91.     Steward received no value in return for the payment of the Fraudulent Dividends, which were distributions to equity holders.  Accordingly, the Fraudulent Dividends were made for less than reasonably equivalent value.

92.     At the time the Fraudulent Dividends were made, Steward was insolvent, or Steward was rendered insolvent as a result of the Fraudulent Dividends.

93.     At the time the Fraudulent Dividends were made, Steward was unable to pay its debts as they came due in the ordinary course of business.

94.     At the time the Fraudulent Dividends were made, Steward was engaged or was about to engage in a business or transaction for which the remaining assets of Steward were unreasonably small in relation to the business or transaction.

95.     At the time the Fraudulent Dividends were made, Steward intended to incur, or believed or reasonably should have believed that it would incur, debts beyond Steward's ability to pay as they became due.

96.     By virtue of the foregoing, the Fraudulent Dividends constituted transfers that were fraudulent as to Aya, and Aya may avoid the transfer to the extent necessary to satisfy its claim against Steward.

97.     Defendant Ralph de la Torre, an insider of Steward, was either the first transferee or a subsequent transferee of the de la Torre Fraudulent Dividend, or a portion thereof, or was a person for whose benefit the de la Torre Fraudulent Dividend, or a portion thereof, was made.

98.    To the extent that the Fraudulent Dividends are avoided, Aya may recover the amount of the de la Torre Fraudulent Dividend transferred to de la Torre to the extent necessary to satisfy its claim against Steward.

99.    MPT was either the first transferee or a subsequent transferee of the MPT Fraudulent Dividend, or an entity for whose benefit the MPT Fraudulent Dividend was made.

100.    To the extent that the Fraudulent Dividends are avoided, Aya may recover the MPT Fraudulent Dividend from MPT to the extent necessary to satisfy Aya's claim against Steward.

101.    Aya may also recover its reasonable costs and attorneys' fees incurred in connection with pursuing this claim pursuant to Tex. Bus. & Com. Code §24.013.

### Count II
**Avoidance and Recovery of Fraudulent Transfers (Intentional)**
**Against All Defendants pursuant to Tex. Bus. & Com. Code § 24.005(a)(1)**

102.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set for the herein.

103.    In January 2021, a date that is within four years of the filing of this Complaint, Steward made the Fraudulent Dividends, pursuant to which Steward transferred $111 million of cash to its equity holders.

104.    At the time the Fraudulent Dividends were made, Aya was a creditor holding a claim against Steward by virtue of amounts that were due and owing from Steward to Aya under the Crisis Staffing Agreement.

105.    At all points in time from the date that the Fraudulent Dividends were made until the date that this Complaint was filed, Aya has remained a creditor of Steward by virtue of amounts that are due and owing from Steward to Aya under the Crisis Staffing Agreement.

106.    Steward made the Fraudulent Dividends with actual intent to hinder, delay, or defraud its creditors, including Aya.

107.    Steward received no value in return for the payment of the Fraudulent Dividends, which were distributions to equity holders.  Accordingly, the Fraudulent Dividends were made for less than reasonably equivalent value.

108.    At the time the Fraudulent Dividends were made, Steward was insolvent, or Steward was rendered insolvent as a result of the Fraudulent Dividends.

109.    At the time the Fraudulent Dividends were made, Steward was unable to pay its debts as they came due in the ordinary course of business.

110.    At the time the Fraudulent Dividends were made, Steward was engaged or was about to engage in a business or transaction for which the remaining assets of Steward were unreasonably small in relation to the business or transaction.

111.    At the time the Fraudulent Dividends were made, Steward intended to incur, or believed or reasonably should have believed that it would incur, debts beyond Steward's ability to pay as they became due.

112.    By virtue of the foregoing, the Fraudulent Dividends constituted transfers that were fraudulent as to Aya, and Aya may avoid the transfers to the extent necessary to satisfy its claim against Steward.

113.    Defendant Ralph de la Torre was either the first transferee or a subsequent transferee of the de la Torre Fraudulent Dividend, or a portion thereof, or a person for whose benefit the de la Torre Fraudulent Dividend, or a portion thereof, was made.

114.    To the extent that the Fraudulent Dividends are avoided, Aya may recover the de la Torre Fraudulent Dividend from de la Torre to the extent necessary to satisfy its claim against Steward.

-18-

115.    MPT was either the first transferee or a subsequent transferee of the MPT Fraudulent Dividend, or an entity for whose benefit the MPT Fraudulent Dividend was made.

116.    To the extent that the Fraudulent Dividends are avoided, Aya may recover the MPT Fraudulent Dividend from MPT to the extent necessary to satisfy Aya's claim against Steward.

117.    Aya may also recover its reasonable costs and attorneys' fees incurred in connection with pursuing this claim pursuant to Tex. Bus. & Com. Code §24.013.

### Jury Demand

118.    In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Aya Healthcare, Inc. demands a jury on all claims so triable.

### Prayer for Relief

WHEREFORE, Plaintiff, Aya Healthcare, Inc. respectfully requests that this Court enter judgment in its favor as requested, and as further set forth below:

A.    Avoiding and setting aside the Fraudulent Dividends to the extent necessary to satisfy Aya's claim against Steward;

B.    Awarding Aya damages against each Defendant that is a respective first or subsequent transferee of any portion of the Fraudulent Dividends, or a person or entity for whom the Fraudulent Dividends or any portion thereof were made, in an amount equal to the amount of the Fraudulent Dividends that were transferred to them or, if that amount is larger than is necessary to satisfy Aya's claim against Steward, in an amount necessary to satisfy Aya's claim against Steward;

C.    Enjoining each of the Defendants from disposing of the asset transferred, or other property of equal value, until Aya receives a judgment on its claims against Steward, or for such other equitable relief as the circumstances may require;

D.  Awarding Aya its reasonable costs and attorneys' fees pursuant to Tex. Bus. & Com. Code §24.013;

E.  Awarding Aya such additional and further relief to which it may be entitled under law or equity.

Dated:  February 20, 2024     Respectfully submitted,

          */s/ Elizabeth M. Chiaviello*
         Peter A. Moir
         Texas Bar No. 14254500
         peter.moir@morganlewis.com
         Elizabeth M. Chiaviello
         Texas Bar No. 24088913
         elizabeth.chiaviello@morganlewis.com
         **MORGAN, LEWIS & BOCKIUS LLP**
         1717 Main Street, Suite 3200
         Dallas, TX 75201-7347
         Telephone: (214) 466-4000
         Facsimile: (214) 466-4001

         Charles L. Solomont*
         Massachusetts Bar No. 557190
         carl.solomont@morganlewis.com
         Andrew J. Gallo*
         Massachusetts Bar No. 645739
         andrew.gallo@morganlewis.com
         Michael C. Polovich,*
         Massachusetts Bar No. 708139
         michael.polovich@morganlewis.com
         **MORGAN, LEWIS & BOCKIUS LLP**
         One Federal Street
         Boston, MA 02110-1726
         Telephone: (617) 341-7700
         Facsimile: (617) 341-7701

         ***To be admitted pro hac vice**

         *Attorneys for Plaintiff Aya Healthcare, Inc.*

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on February 20, 2024 a true and correct copy of the foregoing document was electronically filed via the Court's CM/ECF system, which will send a notification of electronic filing to all counsel of record who have appeared in this case.   The undersigned counsel further certifies that a true and correct copy of the foregoing document will be served on Defendants in accordance with Rule 4 of the Federal Rules of Civil Procedure.

*/s/ Elizabeth M. Chiaviello*
Elizabeth M. Chiaviello